May it please the court. My name is Dan Koenig. I'm the attorney for the plaintiff appellant in this case, Bobbydyne McMillan. Ms. McMillan is in the gallery. Your Honor, the crux of this case and this appeal relates to what we see as the District Court's misapplication of the Supreme Court's decision in Jacobs v. the North Carolina Administrative Office of the Courts, as well as in the U.S. Supreme Court's decision in the Toland v. Cotton case. As laid out in our briefs, Your Honors, we believe that there were a number of instances in which the District Court construed factual issues in a light more favorable to the moving parties as opposed to my client. There were various credibility determinations that appear to have been made. There were other facts that were not really considered that were certainly relevant to the findings and conclusions reached by the District Court. Well, the biggest issue to me is how was she deprived of her property, interest, and continued employment when she voluntarily resigned? Well, she was deprived of her due process rights. First of all, she was deprived of her... Is there a due process right obligation when you voluntarily resign? In this situation, Your Honor, there's the statute in play here, the 115C-325H, which, as we pointed out in our briefs, really underscores and provides the specific procedures that lead to the termination of employment of a tenured teacher such as Ms. McMillan. What is clear is that there was an investigation. There was mention of possible grounds for her suspension and of her employment, none of which were ever really specified or explained to her. That's sort of interesting. Wasn't she given notice? In fact, I didn't think she disputed that Hatch told her... She stated this in the deposition. Hatch told her he had a parent who was upset at the fact that McMillan had asked her son to retrieve medication, putting her son in jeopardy, and that Hatch needed to know exactly what was going on and that McMillan was jeopardizing her job and that this incident could cost her job. That's McMillan's deposition. Yes, Your Honor. And what is elsewhere, it is also established that during that initial conversation the very morning after this incident occurred, Mr. Hatch in his deposition states that there was no specification as to what she had done wrong in the situation. The district court seemed to think that just Ms. McMillan's awareness of her involvement in the situation, and I think what you just referred to as far as what she said about Hatch just saying that he had gotten a complaint from a parent about the son or the child being involved in this situation does not... Retrieving medication, which was in fact contraband. I mean, that seems... And putting her son, the son, in jeopardy. Well, a few things on that point, Your Honor. First of all, Dr. Till, the superintendent of Cumberland County Board of Education, in his deposition, he specifically said that act in and of itself would be insufficient to justify her termination. The act of sending a student in, and in this case the student actually volunteered, and it was Ms. McMillan and Ms. Brown who kind of looked at each other when the student said, I think I know where it is and I can go in and get it if you want me to. And they kind of looked at each other and both agreed and said, okay, sure. My question was only your suggestion earlier that she had no idea what was wrong. Yeah, and I submit that that does not constitute notice of any alleged wrongdoing. Simply, this is a very unique set of circumstances. It was a fluid situation. It was not the sort of thing that happens every day. And Ms. McMillan was, she was dragged into this situation unwillingly at least. She was contacted by Ms. Brown. Instead of Ms. Brown contacting the administration, she reaches out to Ms. McMillan who comes up and has explained what's going on. And then the student volunteers this information and they make this, the student offers to go in and get the whatever it was that was in there that was believed to be cough syrup of some kind. The student goes in and gets it. So that in and of itself, I certainly don't think that constitutes notice of any wrongdoing. And so it's only Ms. McMillan's self-awareness apparently, which I don't think that's what due process requires. And I don't think that's certainly what the statute in pleasure requires in terms of what did she do wrong. The question is whether she had notice that her suspension or termination was caused by contemplating. And the problem that I have, although we've never really gotten to Judge Floyd's, the problem I have is that her own deposition testimony appears to establish or she says that she knew that a parent was upset because the parent's son had been allowed to go get medication, which would upset me pretty badly. My child was allowed or encouraged or whatever to be placed in that situation. And that her job was on the line. And then again, she acknowledges in her deposition that she understood the purpose of the conference was to discuss whether or not grounds existed for her termination and she could be terminated and she said yes. She was asked to give her account of the event and she did. And Till summarized what he understood to be the sequence of events and asked McMillan if he was correct and Ms. McMillan explained why she believed he was incorrect. There didn't seem to be a point at which she had, that she was unaware of what she was facing and why. Well, I do beg to differ, Your Honor. Just again, being aware, and I'll try to address all the different issues that you brought up in there, but just being aware of her involvement in this scenario. She was told that her job was in. But there was no, and she never believed that, sincerely. She never believed that and that's in the record as well. She was never given a reason as to why her job was in jeopardy and that's what due process requires. She was given a reason. Now, whether it was a legitimate reason or not, I mean, she can certainly disagree with the reason. And what was the reason, Your Honor? The reason was that she had been involved in sending a student to recover drugs from a bathroom. But there, And the parent complained, as I certainly would have, about putting her son in that I'm not at all speaking to whether or not it was a legitimate reason. I'm going solely to the question, to your suggestion, that she had no awareness of why her job was in jeopardy after she was told it was and why. Well, Your Honor, there was never any indication to her that that was the reason why. She was told that. Well, that was mentioned to her by Hatch, that a parent was upset. But parents get upset about a lot of things that aren't necessarily justified. What more did she need to be told? She needed to be told that it was a violation, there was some policy or rule that she violated by sending that student into the classroom. But there's nothing in the record to suggest that that is, in fact, other than this casual morning after conversation with Principal Hatch who acknowledged that he didn't really get into the details of anything. He just mentions that they got this call from a teacher and he asked Miss, I think on page 600 and 601 of the appendix of Principal Hatch's testimony. He then just sent her to the classroom to go prepare her statement, which she did. And so, there were, and as I was mentioning a minute ago, there were various other people who had the same, well, Brown did the exact same thing. Miss Brown did not lose her job. Miss Brown, but the allegation, and again, I'm trying to stay away from the merits of the allegation, which you seem to be, you keep trying to go back to. The allegation was that Miss Brown was not alleged to have lied or dissembled about what happened as Miss McMillan was. She was not. There was never any mention of Miss McMillan at any point in time that she had given incorrect or inconsistent or inaccurate information during the course of this investigation. No, she was not. She never was. And Your Honor, I think that, if I may address the hearing, if that's where you want to look, because the hearing, and I think the district court construed her testimony regarding the administrative conference in a light most favorable to the defendants. Miss McMillan was only given an opportunity to explain her version of events. Dr. Till then restated, reiterated what she had just told him to make sure that he had it correct. And she said, no, that's not right. But at no time did he say that he was presenting to her contradictory evidence or that other people had told him something different. She was never confronted with any evidence from anywhere else. Her understanding of that... Where did his contrary understanding of the facts come from? Contrary under... That's the judge's creation. That's the district court's creation. There is nothing in the record. Your Honor, Till, you just said in your explanation to me that Till related his understanding of the situation which differed from hers. Based on what she had just told him. So he was trying to make sure he had it clear what she was saying. He tried to restate what she had just said so he could make sure he understood the timeline. And then he didn't restate it correctly to her, so she then told it again to make sure he got it right. But at no time was that based on an understanding that he was saying, we have contradictory evidence. We have heard to the contrary or confronted her with an inaccuracy or something that is inconsistent with what any other witnesses have said. She was never given the opportunity to confront any witnesses, but much less know what any other witnesses who may have said something contradictory to what she said, she never had an opportunity to address any of those. And so she didn't have a meaningful opportunity to defend herself or to explain any inconsistencies. This was just a situation where she came in, she's asked to present her version of events. She does so. He wants to make sure he has it right. She says, no, that's not right. But not addressing contradictory statements from other people. What she had tried to explain previously the first time, maybe it wasn't, she didn't enunciate or maybe she didn't explain it as clearly as she would have liked, but she had an opportunity to clarify what she had said. But at no time does the record support that she understood or believed that he was confronting her with contradictory evidence. She was never presented with anything to that effect. Did she ever request clarification? Because factually, sort of on the face of it, it seems pretty clear to me what she was in trouble for. Did she ever seek any kind of clarification or ask for additional time or did she do anything to introduce clarity into a situation that she says is unclear? Well, she trusted throughout this process, your honors, that they were going to figure this thing out. She never believed she did anything wrong in the handling of this situation. She trusted that she came in, she told them what happened. They didn't tell her and you mentioned that they were looking as to whether or not there were grounds which suggests that they didn't know whether there were grounds at that point, so she could not have been made aware of the grounds if they were still trying to figure out whether they existed. We're just not going to agree. She was clearly told the grounds. What you're saying is they didn't point to a specific policy that prevented her from doing what she did, I guess. But she was told the basis for what happened there. Other than the informal, the very quick and brief hallway encounter with Hatch, was she ever told why or what she had done wrong, what violation of any rule or policy she had committed? Why wouldn't that be enough? Why wouldn't the principal telling you, I have a complaint from a parent who's concerned that you put her son in trouble, or possible trouble, and she understood what the circumstances were. I just don't understand what at that point in the process ... I think due process requires a specification of the charges. What did you do wrong so that you can respond and defend yourself? She was never told beyond, and like I said before, I know you don't get back to the disputes of fact, but there was certainly one other teacher involved who did the same thing that she did. I know. Brown knew exactly ... But that was not ... That was part of it. Brown agreed that the student go in just the same, and the evidence before the court is that MacMillan and Brown both agreed that the student would go after the student volunteered that he thought he knew where this cough syrup was, that he could go into the bathroom and see if it was there, and if so, he brought it back out. But the fact that a parent called in and made a complaint ... Actually, the complaint in the record, the complaint was about an administrator. The written complaint in the record does not ... says that it was an assistant principal, a male assistant principal that the complaint was about. There's not any written report that I have seen that I can recall being anywhere in the record about somebody complaining about Ms. MacMillan, other than I think Hatch's report about the conversation that he had. But that is in the moment after she heard nothing else about this situation for a month. She, at one point, just asked Hatch if ... Not until after a month. She continued to work for nearly another month without hearing a word about this. After she submitted her written statement, she turned in, she said, Mr. Hatch, I still have the bottle of medication that was recovered. Gave it to him the very next morning, and then nothing more about it. Nothing more until she gets hand-delivered on about a month later. She's working all this time, carrying on as a teacher, doing what she loves, and she's handed this letter that doesn't specify anything about what she did wrong. Is an investigation underway? Well, she provided a written statement, so I think there's some awareness of them looking into what was going on with this whole situation. But still, though, there was never, even in the written letter that she got on May 21, there was never anything specified about what she did wrong. At the administrative conference, they never told her what she did wrong. Dr. Till has no memory whatsoever of this administrative conference. There was never any writing put in place. The statute clearly requires, after he makes a determination that he's going to recommend dismissal, which he said he had done after the administrative conference, there is a specific, and I submit under federal due process, but also under the North Carolina statute 115C-325, there is a very clear obligation to provide detailed written notice to the teacher about what they did wrong, the grounds for the recommendation, an opportunity to use. Looking back at some of the deposition testimony, McMillan said she understood that Till was weighing her credibility against the credibility of other sources who gave contradictory accounts. It doesn't say contradictory accounts, if I remember correctly. She did, as a general understanding, she understood that sure, they're going to talk to other people and he's going to figure out, but she had not been confronted with anything contradictory or inaccurate that she had said. That never happened in the administrative conference. Yeah, I think it's fair, anybody would assume if there's this investigation going on that there's going to be some, yeah, they're going to consider all the different witnesses, but in this case, sure, she figured he was going to talk to other people and she didn't think there was anything that was going to come out of this that was going to ultimately cause her harm. Because there were a lot of other people involved in this situation and it's one of those things where unfortunately, there wasn't a bring everybody together and say, look everybody, the four or five people who were involved, here's the way we're going to handle this thing going forward. Unfortunately, there was finger pointing, blame had to be allocated and she got railroaded into resigning without being told ever what she did wrong and without the school board following the very clear, specific provisions in the statute that are clearly intended to follow and provide due process rights to tenured teachers. And I've gone over my time, I think. And those are contract questions, aren't they? They're contract and due process, your honor, and that's where if we had known when we filed this complaint that the provisions, the school law, the generic phrase that's referenced and that we confirmed at the 30B6 deposition, all this school law with these procedures, that those were incorporated into her contract, we would have included the contract claim. We certainly specified that they breached it by not following the procedure. So we have all the allegations in there, but we just didn't include the actual breach of contract which was produced in discovery in June. 30B6 happened 1st of December. We filed our motion to amend two weeks later. Problem is, though, you chose to bring a suit under 1983, therefore, the constitutional question, you're left with the body of law that talks about what she's entitled in terms of due process. It basically is notice and an opportunity to be heard. It's rather narrow. So in that context, I don't want to go over it, but Judge Duncan was very meticulously going over it in terms of the facts of the case as they stand in the record. It's clear that she knew what it was about. Let's assume that everything that was said was false. Let's assume that she knew at least what their view was about what she did, and it was about the student. So that's the notice. She knows what's going on. She had read the statement. She was told then that this could jeopardize your job. And back to Judge Floyd's initial question is, having you waived it, if you said, I'm resigning, therefore, you have aborted the normal process of opportunity to be heard and call witnesses, isn't that correct? With all due respect, Your Honor, no, and there are a lot of factual issues. Where did I go off the rails? Well, first of all, with respect to the due process standard, yeah, the notice, the specification of the charges against her, and opportunity. She understood what the charges were. Well, all the... I think you really... I appreciate Judge Gregory's questions, which were far more concrete and kind of rambling, but she knew what the problem was, and she knew exactly what they thought she had done wrong. The question isn't whether it was wrong. The question is, she knew what, why her job was on the line, and she had an opportunity to respond to that. Well, Your Honor... The process writ large doesn't seem to me to require more. One quick point on that. What they ultimately, and this didn't come out until this lawsuit, or until well after the fact, but what they ultimately claimed to have, or were recommending termination for, was based on alleged inconsistencies or misstatement of the facts. That's what they decided to let her go on. It wasn't the fact that she and Ms. Brown sent this student into the bathroom after he volunteered to go see if the cough medicine was still there. That's not why they let her go. No, that was part of it. But she had no notice of anything, or anything that was necessarily wrong about it, what she needed to specifically address in her meeting with them to be able to say, this is why I did it, this is exactly what happened. There was not any awareness of that so that she could really drill down on what they were focused in, on what they viewed as important in terms of her alleged wrongdoing. She never had a meaningful opportunity to defend herself. And I think construing the facts in the light most favorable to her, in terms of that administrative conference and what was said, I don't think it's fair at summary judgment stage. I think a reasonable jury could say, they didn't confront her with anything contradictory or anything that she had done wrong. Till was just restating to her to make sure he got right what she had just said. This wasn't a, well, why did you do this? There's this conflict here in the testimony, or this fact here. Explain that to us. Give us an opportunity to explain this discrepancy, or why you said this, or why Ms. Brown or Ms. Carpenter or Ms. Leath or Principal Hash, why they say this happened and accuse you of trying to cover up what occurred. She lost her job really because of an alleged cover-up, not because, as Dr. Till made clear in his deposition, it wasn't because of this initial decision in the heat of a moment in a fluid situation when a student volunteered to go in and recover what was cough medicine that the student had taken from her home. Maybe that's what she's concerned about. This student had taken this from her home. It had belonged to her daughter who had died the year before, and it was still in the medicine cabinet. But I just think due process requires more than this very brief encounter where she, at the very beginning of the investigation, where she is asked to go prepare her written statement, and then we'll go from there. Thank you, Your Honors. Thank you, Counsel.  Thank you, Your Honors. May it please the Court. Your Honors, the fundamental thread that runs throughout this case is whether Ms. McMillan was denied the opportunity to make a free and informed choice. And Judge Floyd, you asked the correct question, in my view, on the 1983 claim, and that is because this factual situation was a resignation, not a termination. And so all of the United States Supreme Court under the Loudermill test, and all of the cases that follow that, are where you had a pre-termination hearing, and the court would go through the Loudermill test to determine whether or not there was satisfactory due process in that pre-termination process. What we have here is a voluntary resignation by Ms. McMillan, and respectfully, Your Honor, I believe that the outcome of this case is controlled by this Court's determinations in the Stone case and also Riccio versus County of Fairfax. Let's assume I'm wrong about that, but hypothetically, are you aware of any contradictory evidence that was going to be or was used against the appellate during the process that you went through? Let me make sure I'm understanding your question correctly. If we're going back to the discussion between counsel and judgment primarily. There was, Your Honor, during the month that intervened between the events of April 25th, the conversation between Principal Hatch and Ms. McMillan, where she was informed of the fact that she was at risk of losing her job. There was an investigation done. Mr. Hatch, the principal, was involved. The assistant principal was involved. And Dr. Locklear, who is the director of HR, superintendent of HR, obtained statements, reviewed the various elements of that, and ultimately, in consultation with Dr. Till, reached the conclusion that they needed to bring Ms. McMillan in under the very serious pretense of, we're going to discuss whether or not you are going to lose your job. So, yes, there was an investigation done. And the facts underlie, do establish that the assistant principal, Leith, and McMillan have a differing set of opinions or differing recollection on what Ms. McMillan told Ms. Leith. That is in the record, and it is part of this case. It was Finnergan, right? Not cough syrup. Yes, Your Honor. Yes, Your Honor. And the Finnergan was being mixed with Sprite and a couple of other ingredients to make a street cocktail. Is that prescription anti-nausea? It is, Your Honor. And these young men were mixing it in the bathroom. I'm sorry. I got you off track. You're getting to the contradictory evidence. So that's the contradictory evidence. Did she know that? What's that? Was she told about any of that? The record evidence in the light most favorable to McMillan does not show that. It does not show that she was told that Leith had contradicted her emailed statement. There was an emailed statement by McMillan which says, I told Leith everything, basically. Leith says that's not true. She did not tell me about X, Y, and Z. Now, to answer your question specifically in the light most favorable to McMillan, she was not provided that contradictory evidence by Leith. However, it doesn't matter in this case. Frankly, it doesn't matter whether you agree that this was a voluntary resignation or whether you get past the voluntariness of the resignation and get to a due process analysis under Laddermill. But just going back to the resignation, because I think this is significant, there's absolutely no question in this case that the document where she signed is at the very end of the appendix just before the district court's order where she voluntarily resigned. To talk about her testimony on that, she testified beginning, and the testimony runs for several pages, but beginning at JA-213 regarding the meeting on 5-25. This is after she's had a month's notice that this is going on and that it is significant. She is informed in the later meeting with Locklear that Dr. Till's decision is dismissal. Her immediate reaction was, my heart sank and I asked about letters of recommendation. Then I was told, Dr. Locklear said, in lieu of dismissal, you could resign. I signed the resignation, and the very next question in the deposition was one word, why? Why? Her answer, because to me, a letter of resignation looked better than a letter of being dismissed. I felt I had a better chance of seeking employment elsewhere. And then on JA-215, the question was, did you believe that resigning gave you the best chance of being able to teach elsewhere? I did. Is that why you chose to resign? Yes, it is. Well, that is kind of a duh proposition. Obviously, the fact that she, but it's not as though the decision was completely without pressure. But, Your Honor, this court's opinions in Stone and Riccio acknowledge the fact that almost always when you're in this situation, you're going to have pressure. There's no pressure if you're not at risk of losing your job. And the courts have made it very clear that that tough decision of, hey, I'm going to get fired or I can go ahead and voluntarily resign, doesn't end the analysis. It does not, in other words, say it's not voluntary. If this was Title VII, certainly this would be a constructive discharge. I mean, it wouldn't stop you from being, you agree with that. It's a different context. Well, Your Honor. You seem to have a problem with that. With Grace, I'm not a Title VII specialist, so I'll accept the court's. Never mind. We'll stay in the same lane then. You have a case, though, certainly. Sure. There is. I think so. But in this case. To answer Judge Floyd's question about other evidence, the evidence you had that admitted on this record she didn't know about, it was only worse, correct, for her? Yes. It wasn't that there would be a different case, as opposed to that what was coming down the line was exoneration, exculpatory, and she didn't have a chance to know that. But you're saying it would be worse than any of that. That's correct. And, Your Honors, I think it's significant to note her own mental status. On April 26th, the day that the parent came in and said, I cannot believe you let my son go into that bathroom and get the drugs, and she had the conversation with Hatch where she was told she was at risk of losing her job. Later that day, and this is at JA 185, she had a conversation with a social worker named McLaurin. And McLaurin was trying to make her feel better. And McLaurin said, I don't think this is going to be so bad. And the next question was, did you agree with her assessment? And Ms. McMillan's answer was, no, I didn't agree with that. This was a serious incident. She knew it was a serious incident. There's no question. I found it. Okay. 198, Ms. McMillan's deposition. The doctor told you that Dr. Till would have to consider things and get back to you. Yes. What did you understand Dr. Locklear to mean, that when Dr. Till had an opportunity to think the situation over, he would get back to me? What was your understanding of what Dr. Till was trying to decide, whether what I said was the truth or whether what he had heard was the truth? Correct. That is correct. And, Your Honor, and that's because, and respectfully disagree with counsel on this, again, this 522 meeting that's referenced in those pages deals with she was given the letter on 521 that clearly said you're at risk of losing your job and gave her specific reference to the North Carolina statute, which she admits she never went to look up. But she came and she was told, we want to hear your side of the story. Then Dr. Till recited what he had learned, meaning what Locklear's investigation had turned up. And Ms. McMillan disagreed with it, which assuming that you get past the voluntary resignation piece, which the district court did, and just go to a pure due process analysis, it clearly meets a due process analysis under the Latimer test. It was absolutely an opportunity to be heard. No question about it. Correct. And she knew what the issues were. She was not hijacked. There was no secrets about the fact that they were there to talk about this incident. There are, and before I lose this thought, there is a couple of cases from this court that speak to the fact that the employer isn't obligated to open up and give everything that's in their file. Two specifically, the Reggio v. County of Fairfax case, and also the Linton v. Frederick County case, both cited in the materials and I also believe cited in the district court's order, make it clear that the minimum, as Judge Gregory noted, the minimum test of due process, this isn't a full criminal hearing. This isn't, A, she wasn't accused of a crime and she had not been charged. This was you're looking at the limited property right in public employment as a teacher. And what Latimer sets forth is a very basic test of a notice of the basic charges and an opportunity to be heard. And that's based on the state's failure to follow its own procedure does not mean that a plaintiff suffered a federal due process. That's correct. And that's your argument. That's right, Your Honor. And Latimer makes it clear, and there's other cases that are cited in the materials and the briefs, that make it clear that the standard that's involved in a state teacher who has tenure, which was the facts of the Latimer case, is minimal federal, when they're bringing a 1983 claim as opposed to having sued in state court and specifically just for breach of contract, for example, and not having pled a 1983 claim. But when you bring a section 1983 claim, Latimer makes it clear that you are entitled only to minimum due process and sets it out. And there's just a plethora of evidence in this case that that was met. Because your client did not demonstrate a paradigm of procedure, right? The letter given to her cited the wrong statute. Your Honors, I spent some time looking at that, and I can tell you it did not, in my view, cite an incorrect statute. It cited the statute. It went to the precise sub-portion of the statute, J, that dealt with what we were about to do. And J has nine, I believe, numbered sub-sections. So it's J1, J2, J3, so forth. And then it goes all the way through H. And in the letter they said the statute parentheses J, and then the next parentheses 1 hyphen through H. And in any event, I think it's, as your Honor said in a prior argument, a distinction without a difference for the simple reason that anyone who opens that statute, which they did give the correct statutory cite, is then presented with the entire statute. So the letter gave the correct statute in its form that would have enabled anyone, even a layperson, to pull open or Google the general statute and get the entire statute. These are difficult cases. I mean, obviously, on the record, it seems like Pellon is a very dedicated educator and obviously under these facts he had more than just a head for education as an educator, but a heart for it as well in terms of this young man. So we do take these things very seriously. He's a tenured teacher in looking at that And also the questions counsel raised about, of course, that's for a merit question about the other person was not terminated. But I guess we're left with how the case is brought and what the law that applies. I believe that's correct, Judge Gregory, and I do not dispute, nor if my client were here. Unfortunately, Dr. Locklear has passed. But if my client were here, they wouldn't dispute that either. And I think in Ms. McMillan's own testimony, she says in multiple places that Locklear and Hatch commented on the fact that she does have heart and she is trying to look out for the best interests of students. But, Your Honors, respectfully, not all folks with good intentions ultimately make great choices. What happens if we decide this case that she voluntarily resigned? What happens to that termination stuff out there? Your Honor, if the court follows, as I believe it should, the analysis in Stone and Riccio and concludes that this was a voluntary resignation, then that concludes the 1983 analysis. At that point... What happens to the termination on the record out there? Her employment record? Her employment record. Well, there is no termination on her employment record. Her employment record shows she's resigned. Yeah, I mean, that's the entire... And I'm sorry if I didn't make that clear at the very beginning. That form, for Your Honor's reference, is literally the last document in the JA, the appendix before the district court's opinion. But that document is her file, and it shows clearly that she resigned. And interestingly, it shows she resigned for other reasons. It doesn't even show that she resigned to avoid termination. So her employment record does not show termination. That was just sort of an interesting question. Maybe it wouldn't even be in her best interest to get to know the due process issue. I just hadn't thought about it. To me, Your Honor... Right. I'm sorry, it caused me to think about something else. In any event, to me this case has always been a case about resignation. And the analysis set forth in stone about whether it was voluntary or involuntary, which I haven't gotten here to today. But in the three and a half minutes left, if I could go very quickly through that, if it's voluntary, you're done. There's no further implication in 1983. If it's involuntary, what the stone court set out is, in essence, a totality of the circumstances test that looks holistically at the fundamental question of, was she denied the opportunity to make a free and informed choice? And as we've discussed here today, both with co-counsel and myself, in multiple places in her deposition, and her deposition is where I urge the court to go in this de novo review. She was aware, after talking with Hatch, that her job was at risk. She was aware, after talking to the social worker, that this was a serious issue. There is, contrary to what counsel said, there was discussion in her deposition about there being a buzz in the school about what was going on with her during that intervening month. On May 21st, she was handed the letter that said, this is a serious issue and we're potentially terminating your employment. She understood that the meeting was to discuss whether grounds existed to terminate the employment. After the meeting, she understood until she was considering it. And at no time was she pressured. And the record shows that at one point in time, they tried to schedule a meeting and she said, that's not good for me, can I move it later? And they said, fine. There's several cases from this district which show coercion in the form of a failure. You've got them pinned in a room and they say, hey, I'd like to talk to a lawyer. I want to talk to my union representative. And the people declined while they were in the room. No evidence of that whatsoever. The record is very clear that Locklear and Till answered her questions as she had them. Unfortunately, what the record makes very, very clear in multiple admissions in her deposition is that she did not do anything in her month to find out anything. She didn't talk to a lawyer. She didn't talk to her Association of Educators folks. She didn't talk to anyone at the school. She didn't do basic research in terms of just reading her own contract or reading the employee handbook, all of which contain this information. So under the stone test, clearly there was no coercion. And the other subset of cases deals with misrepresentation. And in the minute I have left, very quickly on that, this record is replete with her failure to reasonably justify this court upholding the district court's finding that there was no reasonable or justifiable reliance, which guts the misrepresentation piece under stone, and it also deals with the negligence and fraudulent misrepresentation claims that were the other things pled. So with respect, Ms. McMillan conceitedly is a very wonderful person who cared in her heart. She made a mistake. Ultimately, she went. There was evidence created. She had the opportunity to be heard. She was heard. She was informed that she was going to be terminated, and she made the voluntary decision to resign in lieu of being terminated. And that's what this case was about, and respectfully, Your Honors, we would ask that this court uphold the district court's grant of summary judgment on all claims pled. Thank you very much. Thank you, Mr. Lewis. Mr. Kinnick, you have some time reserved. I was wondering whether I had time to go over there. I appreciate it. First, I want to note that the issue addressed in the Stone case regarding the voluntariness, that was not addressed at all in the district court's decision. The district court didn't even cite Stone or discuss Stone in our brief. We certainly did at the lower court level as that issue was being addressed and was certainly an issue, but it was not argued and briefed in this case. And as the court stated, it's an opinion. We do not address that here, and the court simply proceeded to address the due process issue. In this case, there is a, you know, and I'm happy to address more the voluntary resignation issue, and it kind of ties into some degree with the reasonable reliance. But in this situation, though, there was, and I understand that, yes, it was mentioned to her in the immediate aftermath that, oh, this could affect your job, and Hatch commented that, Principal Hatch commented that he was concerned about the media getting wind of this, and who knows what the thought process was when Hatch mentioned that her job could be in jeopardy. He didn't say, he didn't elaborate on that other than commenting about the media is going to get a hold of this, and this may be a problem, and he just asked her to go write her statement. Now, in terms of the, you know, the ensuing month after she provided her statement, and as far as the notice, what she knew about, and as counsel conceded, she did not know about any of the contradictory evidence that had been gathered. That was simply not brought up with her, and ultimately, though, that is what led to her, the decision to terminate her. She was never made aware of that and given an opportunity to address those, that contradictory testimony, which we take very serious issue with in terms of what some of those allegations are. Those are very, very much disputed facts in terms of what Vice Principal Leath said, so that is a very much contested issue of fact, and so, you know, there's another carpenter, teacher, Ms. Carpenter, actually stood lookout for student A as he went back into the bathroom. So, you have two other teachers with the same knowledge and information about this student going into the bathroom to recover this medication, and as Till pointed out, that alone was not sufficient. Again, Ms. McMillan is the only person who lost her job, and so it necessarily, based on the facts before the court, had to do with something other than that initial decision that she and Brown made to respond affirmatively to the student's offer, who then passed by Ms. Carpenter on the way in, told her to stand lookout while he went into the bathroom to look for this. So, in no dispute, she never had any ability to address those issues. So, I think that is where the notice of what the allegations are against her. Now, the reference to this vague statute in the May 21 letter that doesn't even reference the incident, but yeah, sure, she knew it had to do with this situation, but it didn't say anything that she had done wrong. It didn't specify any type of particular rule or procedure. I think if you're going to give the benefit of the doubt to the nonexistent statute that was cited and try to figure out which one they meant to refer to, it was such other rules and regulations as the school board may apply, which is pretty much meaningless without specifying which one and what she violated. And so, there was not, there's no meaningful opportunity to defend yourself, to address allegations of wrongdoing if you don't know what they are. And if there's this assumption that, well, you know what you did, you should have known better, and just assume that, I mean, that's not what due process is about. It's about making the person who's accused of some sort of wrongdoing aware of what they actually did, so they get a fair opportunity to address it. Now, the procedures to which she was entitled as a tenured teacher, as soon as Till made his decision to recommend dismissal, as he acknowledged had been done, there is an affirmative obligation at that point to provide very detailed written notice to Ms. McMillan regarding what her rights were, what she had done wrong, what are the specific grounds. They're supposed to give her a copy of the statute. And then she has a right to an administrative hearing at which there is an exchange of evidence and documents that each side intends to produce or use at the hearing, a witness list, that sort of thing. She was entitled to all that, but there was no discussion, no mention made. This all happened very quickly. In the course of, she gets hand-delivered the letter on Monday afternoon. Administrative conference is Tuesday afternoon. Friday, she's called into Dr. Locklear's office. He said he's made his decision. It's final. Gave her the impression she had two choices. You're going to be fired or you have to resign. If you ever want to continue teaching children again and continue to do great things for children, you need to resign because the decision's final. That's what the record reflects. He led her to believe that this was a done deal when he did not have the authority to terminate her employment. He only had the authority to recommend her dismissal. And then upon that recommendation, provide all this information about her rights, which was never explained to her. The onus is on the school board to inform her. The burden is not on her, a teacher of 20-plus years, who's not been in trouble, who's working with kids. The burden is not on her to try to go interpret what her legal rights or what her legal responsibilities are in a situation such as that. I don't know many of us, even those of us well-connected in the legal community, who can maybe get an appointment with an attorney on three days' notice prior to being called into this meeting with Locklear, where he made these false statements and misrepresentations to her, upon which she relied. He is the associate superintendent of human resources. If she can't trust him, who can she trust? He had the tender of resignation form prefilled out, dated for that very day, and made it appear to her that she had no choice, other than to sign that that day, if she wanted to continue her life's work of teaching and working with students. There's ample evidence that it was reasonable for her under the circumstances. I think a reasonable jury, who's not an HR professional, who's not an attorney, can say, under these circumstances, sure it was reasonable for her to do what she did, and to not go lawyer up the day after an administrative hearing, where they're simply asking her questions about what happened, and she's not being confronted with anything wrong or contradictory that she necessarily did. That's the evidence before the court. These facts were all construed in a light most favorable to the moving parties and not Ms. McMillan. I believe I'm out of time. Thank you, Your Honors.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd